**WEST PENN POWER COMPANY,**
Petitioner,

v.

**PENNSYLVANIA PUBLIC UTILITY**
**COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 4, 1995.
Decided May 25, 1995.

William J. Murphy for petitioner.

Kathryn G. Sophy, Asst. Counsel, for respondent.

Steven F. Baicker–McKee, for intervenor Alleghey Ludlum Corp.

Robert F. Shapiro, for intervenor Washington Power Co. L.P.

Clifford B. Levine, for intervenor Mon Valley Energy Corp.

Michael L. Kurtz, for intervenor Armco Advanced Materials Company, a Business Unit of Armco, Inc.

John G. Short, for intervenor Milesburg Energy, Inc.

Before PELLEGRINI and FRIEDMAN, JJ., and DELLA PORTA, Senior Judge.

PELLEGRINI, Judge.

West Penn Power Company (West Penn) petitions for review of an order of the Pennsylvania Public Utility Commission (PUC) dismissing a complaint filed by West Penn requesting the rescission of prior orders approving rates associated with three qualifying facilities (QFs), the Burgettstown Power Station, the Shannopin Power Station, and the Milesburg Power Station. *See* Section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 824a–3.

## I.

PURPA was enacted as part of the National Energy Act during a time of nationwide energy crisis. Congress sought to lessen the dependence of electric utilities on foreign oil and on natural gas by encouraging the development of alternative power sources in the form of cogeneration and small power production facilities.[1] Section 210(a) of PURPA directs the Federal Energy Regulatory Commission (FERC) to promulgate rules to encourage the development of the alternative sources of power, including rules requiring utilities to offer to buy electricity from qualifying cogeneration facilities and small power production facilities, and requiring the setting of rates that are just and reasonable to consumers. The determination of rates under Section 210(b) of PURPA is not to exceed the incremental cost to the utility of alternative electric energy. Additionally, Section 210(e) directs FERC to adopt rules exempting QFs from most state public utility regulation. For further discussion of PURPA and the federal regulations implementing PURPA, *see Barasch v. Pennsylvania Public Utility Commission,* 119 Pa.Commonwealth Ct. 81, 546 A.2d 1296 (1988), *petition for allowance of appeal denied,* 523 Pa. 652, 567 A.2d 655 (1989) *(Milesburg I )*.

To further encourage these alternate power sources, Congress also sought to reduce the burden of state and federal regulation on these new types of power generators. *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Section 210(e) of PURPA requires FERC to implement regulations exempting QFs from regulations to which traditional electric utilities are subject, including most provisions of the Federal Power Act and "[s]tate laws and regulations respecting the rates, or respecting the finan-

---

1. Section 201 of PURPA, defines "cogeneration facility" as one that produces both electric energy and some other form of useful energy, such as heat. 16 U.S.C. § 796(18)(A). "Small power production facility" is defined as one that has a production capacity of no more than 80 megawatts and uses as a primary energy source biomass, waste, geothermal resources or renewable resources such as wind, water or solar energy to produce electric power. 16 U.S.C. § 796(17)(A).

cial or organizational regulation, of electric utilities." 16 U.S.C. § 824a–3(e)(1).[2]

■ PURPA had the unintended consequence of promoting competition in the electric industry in that non-utility, independent power producers[3] are entering the market to supply electrical power both to utilities and to large customers. To promote this emerging competition, Congress enacted the Energy Policy Act of 1992[4] giving FERC certain powers to open the wholesale electrical market. Implementing the expanded "wheeling"[5] authority it was given in the Energy Policy Act, FERC issued a policy statement increasing competition by establishing transmission pricing policies. *See* Policy Statement at Docket No. RM93–19–000 (October 26, 1994).

If this move to competition is fully implemented, traditional vertically integrated monopolistic territorial utilities may be impacted if they have "stranded investment" because it is non-competitive or if there is need for less capacity because of less demand. Stranded investment represents that portion of capacity which has capital costs and operating costs so great that the power is produced at a cost that will not be competitive in the coming competitive marketplace and has the potential to be written off. As to loss of demand, potential independent power producers or, for that matter, other utilities will have the ability to wheel power into their market, taking away, at least initially, their large industrial and commercial customers by offering lower priced power, thereby lowering the demand and need for capacity.

These concerns are at the core of the disputes concerning PURPA contracts taking place before courts and regulatory bodies throughout this country. *See, e.g., Freehold Cogeneration Associates v. Board of Regulatory Commissioners of the State of New Jersey,* 44 F.3d 1178 (3rd Cir.1995). Because those contracts are "take or pay" at "avoided cost"[6], there is a concern that QF contracts may be another form of stranded investment. The fear is either QFs will supply energy that the utility no longer needs because customers have walked away with their demand and are purchasing from independent power producers or that the avoided costs paid for QF power is at a cost higher than the cost of power that may become available in the potential competitive marketplace. *See* Part III B discussion relating to *In re Southern California Edison Company,* F.E.R.C. No. EL95–16–000 and No. EL95–19–000, 1995 WL 169000, issued February 23, 1995. However, despite Congressional intent to foster competition and the concerns of utilities and FERC, Congress has yet to amend or repeal PURPA and the requirement that utilities purchase QF power.

## II.

While that is the legal and market landscape behind the dispute, the phrase that a case has a long and torturous history, though overused, certainly applies. It all began when West Penn negotiated and signed electric energy purchase agreements (EEPAs) in 1987 with Washington Power Company, L.P. (Washington) as the developer of the Burgettstown Power Station, with Mon Valley Energy Corporation (Mon Valley) as the developer of the Shannopin Power Station, and

**2.** FERC has acted pursuant to Section 210(e)(1) of PURPA by promulgating regulations exempting the QFs from federal and state regulations. In pertinent part, 18 C.F.R. § 292.602(c) states:

(1) Any [QF] shall be exempted ... from State law or regulation respecting:
(i) The rates of electric utilities; and
(ii) The financial and organizational regulation of electric utilities.

**3.** As defined under PURPA, an "Independent Power Production Facility" is a facility generating energy, other than a QF or a utility, and that is unaffiliated with the utility purchaser and is

not in the utility's rate base. *See* 42 U.S.C. § 765lo.

**4.** *See* 16 U.S.C. §§ 824j, 824k. This act, like PURPA, amends numerous sections of the Federal Power Act.

**5.** "Wheeling" is the movement of electricity on the transmission system of one utility for another entity. *See* 16 U.S.C. § 824a.

**6.** Avoided costs are the incremental costs to an electric utility of energy or capacity that but for the purchase from the qualifying facility or facilities such utility would generate itself or purchase from another source. 18 C.F.R. § 292.101(b)(6).

with Milesburg Energy, Inc. (Milesburg) as the developer of the Milesburg Power Station. The EEPAs incorporated rates agreed on in principle in 1986 which were based on West Penn's own determination of its avoided costs and were calculated to be at or below those avoided costs as of 1986. The EEPAs were made conditional on the promulgation of a rule or the issuance of an order by the PUC approving the legality of the agreements and specifically determining that the purchase of power would not result in excess capacity.[7]

Related litigation began when West Penn filed a petition seeking the PUC's approval of the EEPA for the Milesburg facility and the rates therein. The PUC held that West Penn's agreement was consistent with PURPA, that the rate payments were lower than what West Penn would otherwise incur and that the payments were recoverable. On appeal from the PUC's order, this court held that customer notice and hearings were required on the issues of whether West Penn's payments could be lower through other sources of energy or of whether West Penn needed the capacity. *Milesburg I.*

The PUC then held hearings on those issues for all three QF projects. At these hearings, Milesburg and Washington requested that milestone deadlines[8] related to their EEPAs be extended. Despite its earlier agreement to the contrary, West Penn argued that it no longer had a need for capacity from the QFs and that in fact it did not have such a need at the time it signed the EEPA. At the conclusion of the hearing process for the projects, the PUC approved recovery of the costs associated with all three QFs finding that the rates associated with the QFs were reasonable, that West Penn needed the capacity and that the projects proposed were reasonable to meet that capacity. The PUC also found that the calculation of avoided costs was locked in at the time of serious negotiations. The PUC additionally held that it had the authority to extend the deadlines so that the projects could continue. In doing so, the PUC ordered West Penn to enter contracts integrating the milestone date extensions.

On appeal, this court in an unpublished decision affirmed the PUC's authority to modify the EEPAs and to order West Penn to enter into contracts reflecting the milestone extensions.[9] In a separate appeal, we reversed the PUC's determination that avoided costs should be calculated as of the time of serious negotiations and held that the calculation should be done as of the date of a legally enforceable obligation, that is when the QFs have made a binding commitment to delivering energy and capacity.[10] We determined that because West Penn legally agreed it had a need for capacity when it made the agreements with the QFs, it cannot now change the terms of the agreements because it believes, based on hindsight infor-

7. Where the PUC determines that a utility is producing excess capacity it may exclude the value of the property producing the excess from the rate base and disallow the utility's return on that property. Section 1310(d) of the Public Utility Code, 66 Pa.C.S. § 1310(d).

8. Milestone deadlines are conditions on the QFs in the EEPAs, such as the date by which the finances for the facility must be closed.

9. *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission*, Nos. 2090 and 2097 C.D.1989, filed September 7, 1990, *petition for allowance of appeal denied*, No. 531 W.D.1990 (November 19, 1991) (*Burgettstown I*).

10. *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission*, 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990), *affirmed per curiam*, 535 Pa. 108, 634 A.2d 207 (1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994) (*Milesburg II*); also relevant are the unpublished decisions in *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission*, 135 Pa.Commonwealth Ct. 15, 579 A.2d 1337 (1990), *petition for allowance of appeal denied*, No. 545 W.D.1990, 529 Pa. 623, 600 A.2d 539 (1991) (*Shannopin I*) and *Burgettstown I*. On remand to recalculate avoided costs as of the contract signing date, the PUC entered an order approving recalculations for the Burgettstown project and we affirmed. *Armco Advanced Materials Corp. v. Pennsylvania Public Utility Commission*, 157 Pa.Commonwealth Ct. 150, 629 A.2d 221 (1993), *petition for allowance of appeal denied*, 537 Pa. 642, 644 A.2d 165 (1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 315, 130 L.Ed.2d 277 (1994) (*Burgettstown II*). Additionally, recalculations for the Shannopin project were addressed by the PUC and this court in *West Penn Power Company v. Pennsylvania Public Utility Commission*, 154 Pa.Commonwealth Ct. 136, 623 A.2d 383 (1993) (*Shannopin III*).

mation, that it made an erroneous decision. *West Penn Power Company v. Pennsylvania Public Utility Commission,* 150 Pa.Commonwealth Ct. 349, 615 A.2d 951 (1992), *petition for allowance of appeal denied,* 536 Pa. 631, 637 A.2d 291 (1993), *cert. denied,* — U.S. —, 115 S.Ct. 311, 130 L.Ed.2d 274 (1994) (*Shannopin II* ). Based upon our decision in *Shannopin II,* in *Burgettstown II* this court affirmed the PUC's decision to exclude evidence of current avoided costs as irrelevant to determining avoided costs at the time of a legally enforceable obligation.

Even though our opinions in *Shannopin II* and *Burgettstown II,* affirmed the PUC's calculation of avoided costs, on November 3, 1994, West Penn filed a complaint with the PUC challenging the avoided cost rate for power produced by the three QFs and seeking further review and rescission by the PUC of the prior orders that require West Penn to purchase capacity from the QFs. The gravamen of its complaint was that the purchases from the QFs would result in baseload capacity not needed for service to the public, are overly expensive and would result in unjust and unreasonable rate increases. Because they allege the capacity is not needed, West Penn argues these projects will result in unnecessary capacity costs to its customers over the life of the project of approximately 1.5 billion dollars. The complaint asserted the PUC could entertain it under Sections 701 and 703 of the Public Utility Code (Code), 66 Pa.C.S. §§ 701 and 703, and that

the orders in question violated PURPA. (Reproduced Record 21a).[11]

Washington Power and Mon Valley filed a motion to dismiss the complaint arguing that the relief requested by West Penn was unavailable because it was preempted by federal law and because it was barred by res judicata. They asserted that the complaint was frivolous because West Penn has lost all its possible appeals on the same issues and it was an attempt to harass the project developers.[12]

The PUC addressed the matter as a jurisdictional question, holding that the complaint procedure is not available to West Penn to object to prior orders of the PUC. The PUC states that, although Section 701 of the Code, 66 Pa.C.S. § 701, allows a complaint to be filed by a party who has been required to "observe or carry into effect" a PUC regulation or order, this procedure cannot be utilized in place of a petition for rehearing, rescission or amendment of an order or of an appeal.[13] Moreover, it held, in this case there been ultimate review of the Commission orders through appeals to this court and the Supreme Court. The PUC stated that it has no further jurisdiction over the QFs because they are not "public utilities" under the Code and revisiting the issue of rates is preempted by federal law. It stated that it refused to rescind the orders under Section 703(g) of the Code, 66 Pa.C.S. § 703(g), because it believed the law had been correctly applied to West Penn.

---

**11.** West Penn also filed a motion for a stay or supersedeas because the QFs were proceeding with their projects despite the filing of the complaint. Denying the application for stay, the PUC held that West Penn was seeking a stay of final and non-appealable orders and that the standards for a stay set forth in *Pennsylvania Public Utility Commission v. Process Gas Consumers,* 502 Pa. 545, 467 A.2d 805 (1983) were inapplicable. The PUC also held that even if applicable, West Penn did not meet the *Process Gas* standards because it is not likely to prevail on the merits and it did not show irreparable harm.

**12.** Petitions to intervene were filed by the Office of the Small Business Advocate, West Penn Power Industrials, Allegheny Ludlum Corporation, and Armco Advanced Materials Corporation. The PUC granted all of those petitions to inter-

vene. Before this court, both Armco and Allegheny Ludlum filed briefs as intervenors, in addition to the briefs of the three QFs, which were parties before the PUC.

**13.** Section 701 of the Code provides:

The commission, or any person, corporation, or municipal corporation having an interest in the subject matter, or any public utility concerned, may complain in writing, setting forth any act or thing done or omitted to be done by any public utility in violation, or claimed violation, of any law which the commission has jurisdiction to administer, or of any regulation or order of the commission. Any public utility, or other person, or corporation likewise may *complain of any regulation or order of the* commission, which the complainant is or has been required by the commission to observe or carry into effect....

■ Granting the motions to dismiss, the PUC also held that it had no subject matter jurisdiction because West Penn failed to state a claim that a violation of the Code had occurred. In considering the sections cited by West Penn, the PUC stated that these sections refer to actions by public utilities and the QFs are not public utilities. The PUC further held that res judicata barred West Penn's action because it requested the termination of the EEPAs due to a change in capacity, the exact question previously determined by the PUC and the courts. Therefore, the PUC dismissed West Penn's complaint. West Penn then filed this appeal.[14] Washington filed a Motion to Quash the petition for review and a request for costs, counsel fees and damages for delay under Pa. R.A.P. §§ 2741 and 2744.

All West Penn's arguments are a variation on the theme that they are entitled to raise issues concerning the need for QF power and the PUC cannot dismiss these issues without first giving them a hearing. West Penn contends that the PUC erred in failing to give it a hearing on the allegations in its complaint. It also contends that a complaint is the proper procedure under Sections 701 and 703(g) of the Code and it is not barred by res judicata. West Penn also contends an order granting rescission of the prior orders is not preempted by federal law.

### III.

### A.

■ West Penn contends that the PUC abused its discretion in failing to give it a hearing on its complaint and that this failure violated both its right to due process and Section 703(b) of the Code, 66 Pa.C.S. § 703(b). As to whether the PUC violated West Penn's due process rights, due process only requires an evidentiary hearing before the PUC if there are disputed questions of fact to be resolved and is not necessary if there are only questions of law, policy or discretion. *FDIC v. Mallen*, 486 U.S. 230,

108 S.Ct. 1780, 100 L.Ed.2d 265 (1988); *Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission*, 128 Pa.Commonwealth Ct. 259, 563 A.2d 548 (1989). We can find no issues in this case that would require additional hearings.

This issue is strikingly similar to the issue raised in *SME Bessemer Cement, Inc. v. Pennsylvania Public Utility Commission*, 116 Pa.Commonwealth Ct. 13, 540 A.2d 1006 (1988). In *SME Bessemer*, a commercial customer of power habitually failed to pay its utility bills or pay scheduled payments on its debt to the utility company. The customer continually requested emergency relief from the PUC so that its service would not be terminated. After the scenario repeated itself several times, the PUC without a hearing denied a request to amend its prior order and denied the request for emergency relief. In response to the customer's due process claim, we found that the customer had ample, prior opportunity to litigate the same matter and unless new facts or circumstances are raised, no hearings were required. We held that where hearings were previously provided on the same issue, the PUC properly exercises its discretion to deny a hearing and satisfies the due process requirements of the Fourteenth Amendment of the United States Constitution. *Id.* at 18, 540 A.2d at 1008–1009.

■ As in *SME Bessemer*, West Penn has raised the same arguments in previous proceedings. The PUC determined that there were no factual issues presented by the PUC's complaint because those issues presented had been decided in its prior decisions and affirmed by the courts. West Penn's factual allegations were that the QFs "together represente[d] 203 megawatts of unneeded and overly expensive baseload power" and that the purchase of this power will result in an unjust and unnecessary rate increase to its customers. These issues were heard by the PUC on remand after *Milesburg I*. The PUC, in orders related to each

14. The scope of review of a decision of the PUC is to determine whether constitutional rights have been violated or an error of law committed and whether the necessary findings of fact are supported by substantial evidence in the record.

Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *GPU Industrial v. Pennsylvania Public Utility Commission*, 156 Pa.Commonwealth Ct. 626, 628 A.2d 1187 (1993).

project, found that the capacity was needed at the time the agreements were entered. The PUC also addressed the legal issues and determined that the rates meet the requirements of PURPA, were related to the purchases and were just and reasonable. We affirmed these holdings in the PUC's orders. *See Milesburg II, Shannopin II,* and *Burgettstown II.* West Penn has had ample opportunity for hearings on both the factual issues before the PUC and the legal issues before the agency and the courts. Due process does not require an infinite number of hearings.[15] *SME Bessemer.* Accordingly, the PUC did not violate West Penn's due process rights by refusing to hold a hearing.

### B.

■ As to whether the PUC was required to give West Penn a hearing on its complaint under the Code, Section 703(b) of the Code provides that the PUC "may dismiss any complaint without a hearing if, in its opinion, a hearing is not necessary in the public interest." West Penn argues, however, that a hearing was "in the public interest" because of the change in its need for capacity, citing the dissent in *Shannopin II,* and a recent decision of FERC which although deciding the case on another issue states it has grave concerns about the utility's current need for capacity and the reliance on stale data. *In re Southern California Edison Company,* F.E.R.C. No. EL95–16–000 and No. EL95–

19–000, 1995 WL 169000, issued February 23, 1995.[16]

As to *Shannopin II,* West Penn argues that the dissent pointed out that from the time when the contract was entered into, there have been changes as to capacity need and competition in the industry. We cannot see how *Shannopin II* gives it a right to a hearing now when the majority in that case declined to do so. While two of the members of this panel were dissenters in *Shannopin II,* West Penn offers no rationale for how this court could rely on the dissenting opinion rather than the majority opinion, particularly after its appeals to the Pennsylvania Supreme Court and the United States Supreme Court[17] in that case were denied.

As to *Southern California Edison Company,* FERC expressed a concern over current need for capacity and the staleness of data that West Penn argues makes it in the public interest to reexamine whether the capacity is needed. In that case, FERC held that the procedure used by the California Public Utilities Commission did not properly determine the utility's avoided cost because it excluded potential sources of capacity from which the utility could purchase energy in contravention of the requirements of Section 210 of PURPA. *Id.* slip op. at 26.[18] After so holding, as to capacity and staleness of data, FERC stated:

Finally, based on the record before us at this time, we have grave concerns about the need for this capacity and the staleness

---

15. West Penn argues that after this court determined that the date for determining avoided costs was the time of a legally enforceable obligation, that is the signing of the EEPAs, no hearings were held on whether there was a need for capacity or the combined effects of the orders on West Penn. There was no need for such hearings at that time because as a legal matter West Penn had agreed at the time of the agreements that it did have a need for capacity. *See Shannopin II* and *Burgettstown II.*

16. This case could not have been the basis of West Penn's complaint because it was decided well after the complaint was filed as well as after the PUC rendered its decision.

17. We also note in response to the request of the United States Supreme Court to know its posi-

tion, FERC indicated that it believed certiorari should be denied.

18. The procedure used by the California Commission was to first determine the new resources a utility would add, then determine the assumed costs of the utility for those resources, known as the benchmark price, and to then solicit bids by only QFs, against the benchmark price. *Southern California Edison Company,* slip op. at 2. FERC determined that the process could be used if it reflected prices available from all sources able to sell to the utility, that is, the bidding could not be limited only to QFs. *Id.* slip op. at 26. Because the procedures of the California Commission unlawfully excluded other sources, which were expressly referred to in Section 210 of PURPA, FERC held that the utilities could not lawfully be compelled to enter into contracts resulting from that procedure.

of the data relied upon by the California Commission.

Because we are deciding these cases on other grounds, we do not need to reach a definitive conclusion on these issues.

*Id.* While this expression of concern may or may not be related to West Penn's circumstances,[19] FERC did not mandate any reexamination of data that may or may not be stale, especially, as here, when litigation caused the delay.

■ The other concern expressed in FERC's decision is that the electric industry is in transition to a competitive marketplace and that QF rates that exceed avoided costs will give QFs an unfair advantage in the marketplace. *Id.* slip op. at 22. This statement has been interpreted as FERC adding to the call for the repeal of PURPA by "lending its voice to those who contend that avoided costs contracts could become albatrosses around the necks of electric utilities in a competitive marketplace".[20] While *Southern California Edison Company* states concerns about PURPA contracts being stranded investment in the competitive marketplace, until Congress amends or repeals PURPA, those concerns do not change PURPA mandates so as to require a new hearing in the public interest. In any event, whether West Penn is entitled to a new hearing on the avoided cost of the EEPAs and the purported adverse effect on ratepayers is within the discretion of the PUC to determine. Because there is no abuse of discretion, we have no choice but to affirm the PUC's refusal to provide West Penn a new hearing.

### IV.

■ Even if a hearing was not required, West Penn contends that the PUC erred in dismissing its complaint without reaching its merits. It contends that a new complaint is an appropriate mechanism to raise its objections to the PUC's prior orders. West Penn relies on the second sentence of Section 701 of the Code, which provides:

> Any public utility, or other person, or corporation likewise may complain of any regulation or order of the commission, which the complainant is or has been required by the commission to observe or carry into effect.

The PUC contends that the initiation of a new complaint under this section is inappropriate to challenge past orders. If these orders can be challenged at all, the PUC contends West Penn should have filed a petition for rehearing, rescission or amendment of that order, 66 Pa.C.S. § 703(f) and (g).

■ Contrary to West Penn's position, the complaint process under the second sentence of Section 701 of the Code is not available to challenge prior adverse determinations. That provision allows complaints to be filed by those persons who were not parties to the prior order but were affected by it, for those affected by orders issued without hearings, or for orders with long-term effects (such as ratemaking orders) where circumstances may change, not by a party who has litigated the exact matter previously. *See, e.g., Lehigh Valley Power Committee v. Pennsylvania Public Utility Commission,* 128 Pa.Commonwealth Ct. 276, 289 n. 7, 563 A.2d 557, 563 n. 7 (1989). If we were to adopt West Penn's interpretation of Section 701, if a party to a prior adjudication is dissatisfied, it could just file a new complaint and start anew, and when it lost that complaint it could file another; nothing would ever be final, nothing would ever be settled. West Penn's filing of a new complaint involving matters previously resolved in prior orders of the PUC is not authorized by Section

---

19. That the concerns are related to West Penn's circumstances is doubtful because in *Southern California Edison Company* the utility's contention was that the California Commission had failed to determine its avoided costs at the time the obligation was incurred or at the time of delivery (*see* 18 C.F.R. § 292.304(d)(2)), instead relying on 1990 data even though bids from QFs were not even solicited until 1993. *Id.* slip op. at 3. Moreover, no contracts had ever been signed by the parties (slip op. at 26), whereas in this case, West Penn signed the contracts and the data relied on in the contracts was recent at the time of signing.

20. Lawrence F. Barth, "FERC Examines Avoided Cost", Vol. IX No. 1 *Public Utility Law Section Newsletter* 38, April 1995.

701 of the Code and the PUC did not err in dismissing it on that basis.

## V.

### A.

If it cannot be heard with a "new" complaint, West Penn argues that its complaint should have been considered a petition for reconsideration because it, in part, requested rescission of prior orders under Section 703(g) of the Code, 66 Pa.C.S. § 703(g). That section provides:

> The commission may, at any time, after notice and after opportunity to be heard as provided in this chapter, rescind or amend any order made by it. . . .

The PUC has the discretion whether to act on a petition for rescission or amendment,[21] and because the relief of rescission or amendment under Section 703(g) may result in the disturbance of final orders, it should be granted judiciously and only under appropriate circumstances. *City of Pittsburgh v. Pennsylvania Department of Transportation (Appeal of Pennsylvania Public Utility Commission)*, 490 Pa. 264, 416 A.2d 461 (1980). The PUC has determined that a petitioner under Section 703(g) may raise any matter designed to convince the PUC that it should exercise its discretion to rescind or amend its order. *Philip Duick v. Pennsylvania Gas & Water Company*, 56 Pa.PUC 553, 51 P.U.R.4th 284 (1982) (citing *Pennsylvania Railroad Company v. Pennsylvania Public Service Commission*, 118 Pa.Superior Ct. 380, 179 A. 850 (1935)). However, there is no requirement that the petitioner allege there is new evidence for the PUC to consider a petition for rescission or amendment. *AT & T Communications of Pennsylvania v. Pennsylvania Public Utili-*

*ty Commission*, 130 Pa.Commonwealth Ct. 595, 568 A.2d 1362 (1990).[22]

Because whether to grant or deny a request for reconsideration is a matter of administrative discretion, this court's scope of review of that decision is limited to determining whether the agency abused its discretion. *Georgia–Pacific Corporation v. Unemployment Compensation Board of Review*, 157 Pa.Commonwealth Ct. 651, 630 A.2d 948 (1993); *J.A.M. Cab Company, Inc. v. Pennsylvania Public Utility Commission*, 132 Pa.Commonwealth Ct. 390, 572 A.2d 1317 (1990). An abuse of discretion has occurred only where the agency's decision demonstrates evidence of bad faith, fraud, capricious action or abuse of power. *J.A.M. Cab Company.* West Penn, as the party asserting reconsideration should have been granted by the agency, has the burden of establishing such an abuse of discretion occurred. *Georgia–Pacific.*

Even though West Penn alleges serious adverse consequences to its ratepayers, a mistake, even of the purported magnitude as the one alleged here, does not establish an abuse of discretion. West Penn has not alleged bad faith, fraud, capricious action or abuse of power. Because our scope of review in this case is very narrow, we have no basis to determine that the PUC abused its discretion in refusing to grant reconsideration or to rescind its prior orders.

### B.

The PUC also contends that even if it had been inclined to attempt to examine whether the QF projects were adverse to ratepayers, it was not free to reconsider its prior orders approving the EEPAs or the rates under those agreements because such

---

**21.** Unless a petition is actually one for rehearing because it alleges new evidence is available, a petition for rescission or amendment under Section 703(g) may be characterized as a petition for reconsideration. *See AT & T Communications of Pennsylvania v. Pennsylvania Public Utility Commission*, 130 Pa.Commonwealth Ct. 595, 568 A.2d 1362 (1990).

**22.** *See also Abramson v. Pennsylvania Public Utility Commission*, 489 Pa. 267, 414 A.2d 60 (1980) (a petition requesting an opportunity to present argument as to the propriety of a PUC order in the hopes that the PUC would either modify or rescind its earlier decision is a petition filed under the provision for rescission or amendment rather than one for rehearing, which by its na-

action is preempted[23] by federal law. In the recent case, *Freehold Cogeneration Associates v. Board of Regulatory Commissioners of the State of New Jersey*, 44 F.3d 1178 (3rd Cir.1995), the Third Circuit Court of Appeals held that once the Commissioners approved the power purchase agreement between Freehold, a cogeneration QF, and the public utility, deciding that the rates were consistent with the utility's avoided costs and were just and reasonable, any action or order by the Commissioner to reconsider its approval was preempted by federal law.

In that case, Freehold entered a purchase power agreement with Jersey Central Power & Light in 1992. In 1993, the utility determined that the avoided costs in the agreement were significantly higher than the current avoided costs to the utility. Attempting to protect the ratepayers, the New Jersey Commission directed renegotiation of the contract or a buyout of the QF. Freehold filed an action seeking a declaratory judgment that once a contract was entered into the Commission's action was preempted by PURPA. The Third Circuit determined that PURPA and the implementing regulations establish an extensive federal system to encourage and regulate the sale of energy by QF's:

> Although the states are required under the federal statutory scheme to implement the federal rules, section 210(e) of PURPA requires that the FERC prescribe rules exempting QFs "from state laws and regulations respecting the rates, or respecting the financial or organizational regulation of

electric utility, ..." 16 U.S.C. § 824a3(a)(1).... The present attempt to either modify the [agreement] or revoke [Commission] approval is "utility-type" regulation—exactly the type of regulation from which Freehold is immune under Section 210(e).

*Id.* 44 F.3d at 1191–92.

The Third Circuit determined the Commission was preempted from taking any action because Section 210(e) of PURPA bars reconsideration of the prior approval of an agreement to purchase energy from a QF, absent some basis in the law of contracts for setting it aside. *See also Independent Energy Producers Association; Smith Cogeneration, Inc. v. Corporation Commission*, 863 P.2d 1227 (Okla.1993); *In re Pennsylvania Electric Company (Scrubgrass)*, 66 Pa.PUC 151, 1988 WL 391340 (1988).

 While this court is not bound by the decision of the Third Circuit even when it interprets a federal statute, we concur that Section 210 of PURPA preempts the PUC from reconsidering its prior approval of the EEPAs between West Penn and the QFs or to change the rates established for the avoided costs at the time of the agreements. Unless or until PURPA is amended or repealed, reestablishing regulatory power over the area, it appears that the PUC cannot reexamine contracts for PURPA power. Because such an order would be preempted by federal law, the PUC did not abuse its discretion in refusing to rescind its prior orders as requested in West Penn's complaint.[24]

ture must request to reopen the record or present additional evidence).

**23.** Preemption under the Supremacy Clause of Article VI of the United States Constitution results where Congress in enacting a statute or a federal agency acting within its scope of its delegated authority expresses an intent to preempt state law, when there is a conflict between the federal and state law, where federal law is so comprehensive as to occupy the field of regulation leaving no room for state supplement, or, where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Louisiana Public Service Commission v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *Independent Energy Producers Association, Inc. v. California Public Utilities Commission*, 36 F.3d 848, 853 (1994).

**24.** In its reply brief, West Penn argued this court should "reserve judgment" on this issue until FERC issued its decision on West Penn's petition for a declaratory order, filed with FERC on March 10, 1995 and decided on May 8, 1995 in *West Penn Power Company*, Docket No. EL95–30–000. Although we saw no need to reserve judgment because the petition to FERC was filed subsequent to the PUC's exercise of its discretion, because the petition was decided in the interim, we will briefly discuss its holding.

In that case, West Penn requested that FERC declare that an electric utility is not required to purchase energy or capacity from a QF when the purchase rates are in excess of the utility's current avoided costs and the QF has not yet built its facility. FERC denied the petition for declaratory order. FERC held that it would not enter-

Because the complaint procedure of Section 701 of the Code was an improper method of reviewing the prior orders in this case and because the PUC did not abuse its discretion in refusing to rescind or amend its prior orders under Section 703(g) of the Code, the issues raised in West Penn's complaint were not properly before the PUC. Also, there was no statutory or due process violation by the PUC's refusal to hold a hearing on the same issues that were addressed and finally determined in prior orders of the PUC, this court and the Supreme Court. Although the PUC also considered the issues of res judicata and subject matter jurisdiction, we need not address those issues.[25] Accordingly, we affirm the decision of the PUC dismissing the complaint.

### ORDER

AND NOW, this 25th day of May, 1995, the order of the Pennsylvania Public Utility Commission, dated December 16, 1994, No. C–00946317, is affirmed. The Motion to Quash and the request for further costs, counsel fees and delay damages under Pa.

R.A.P. § 2744, filed by Intervenor, Washington Power Company, L.P., are denied.

---

tain an attempt to relitigate matters settled before Pennsylvania courts in areas that are the province of the state regulators. Slip op. 21. FERC restated its intentions not to adjudicate the specific provisions of individual QF contracts and its finding that PUC's resolution of the issues are not inconsistent with or in violation of PURPA. Slip op. 22. Moreover, FERC reiterated its decision in *New York State Electric & Gas Corporation*, Docket No. EL95–28–000, issued April 12, 1995, that changed circumstances do not require the resetting of established rates under the so-called "lock-in" provisions for long-term fixed rate QF contracts under Section 292.304 of PURPA. Slip op. at 22.

Significantly, FERC encouraged West Penn to "buy out" or "buy down" the contract rather than continue its efforts at litigation. Slip op. at 26. FERC also said it would permit recovery in wholesale rates of a pro rata share to "buy out" or "buy down" QF contracts. By doing so, FERC recognizes that PURPA power can become "stranded investment" and that it will pass the stranded investment onto ratepayers. In this case, even though the construction of these facilities has not yet begun, to "buy out" or "buy down" ratepayers would be required to pay an amount negotiated that compensates not only for expenses, e.g. legal or engineering expenses, but also for loss of profit of the QFs over the life of the contract.

Contrary to what would happen under the laws of this Commonwealth (*see* footnote 7 *supra*),

PURPA, as implemented by FERC, has shifted the cost of excess capacity from those who provide electricity, normally utilities but now including QFs, to ratepayers. As FERC zigs-zags its way through permitting more competition yet continuing to enforce PURPA, it appears that there are going to be more such anomalous results and, for ratepayers, higher energy costs than they would otherwise pay. Despite all of that, FERC's decision is consistent with the PUC's decision in this case.

25. In its Motion to Quash West Penn's appeal, Washington contends that this court lacks jurisdiction over final and nonappealable orders, referring to the prior decisions and orders related to West Penn and the same QFs. It is not jurisdiction over the prior orders that this court must have to act, but rather jurisdiction over a petition to review the PUC's order of December 16, 1994, dismissing the complaint. Washington does not argue that we have no jurisdiction over the instant order. Because the Motion to Quash presents no jurisdictional defect, we deny the motion. Additionally, although agreeing that West Penn's action sought to relitigate the same issues raised in prior proceedings and is an attempt to delay the implementation of the EEPAs, because the motion to quash is unfounded, we deny the request for further costs, counsel fees and delay damages under Pa.R.A.P. § 2744.