RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0185P (6th Cir.)
File Name: 01a0185p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NORTH AMERICAN NATURAL
RESOURCES, INC.; MIDLAND
COGENERATION VENTURE
LIMITED PARTNERSHIP;
MICHIGAN POWER LIMITED
PARTNERSHIP; CENTRAL
WAYNE ENERGY RECOVERY
LIMITED PARTNERSHIP, et al.,
     *Plaintiffs-Appellees,*

     *v.*

JOHN G. STRAND, Chairman,
JOHN C. SHEA and DAVID A.
SVANDA, Commissioners of
the Michigan Public Service
Commission,
     *Defendants-Appellants.*

No. 99-2075

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
Nos. 98-00021; 98-00022; 98-00023; 98-00024
—Gordon J. Quist, District Judge.

Argued: October 31, 2000

Decided and Filed: June 5, 2001

Before: KRUPANSKY, BATCHELDER, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Patricia S. Barone, MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Thomas J. Waters, FRASER, TREBILCOCK & FOSTER, Lansing, Michigan, Robert F. Shapiro, CHADBOURNE & PARKE, Washington, D.C., for Appellees. **ON BRIEF:** Patricia S. Barone, MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, David A. Voges, Henry J. Boynton, OFFICE OF THE ATTORNEY GENERAL, PUBLIC SERVICE DIVISION, Lansing, Michigan, for Appellants. Robert F. Shapiro, CHADBOURNE & PARKE, Washington, D.C., David E. Marvin, Thomas J. Waters, FRASER, TREBILCOCK & FOSTER, Lansing, Michigan, Stephen O. Schultz, FOSTER, SWIFT, COLLINS & SMITH, Lansing, Michigan, for Appellees.

———————————

**OPINION**

———————————

ALICE M. BATCHELDER, Circuit Judge. Appellants, representing the Michigan Public Service Commission ("MPSC"), a state regulatory body, seek review of the district court's order stating that certain regulatory orders issued by the MPSC violate the Public Utilities Regulatory Policies Act of 1978 ("PURPA"). The question presented is whether the MPSC orders created a case or controversy that can be adjudicated by a federal court, and if so, whether the members of the MPSC may be sued in their individual capacities. Finding no case or controversy, we VACATE the order of the

according to the contract. Each of these cases dealt with a situation in which the regulator had taken an action that immediately affected the QFs' contract rights. In the case before us, the regulator has repeatedly disavowed any intent to affect the QFs' contract rights. Even if that were the "secret intent" of the MPSC (and there is no evidence in the record to support this hypothesis), the MPSC would have to issue another order before 2008 to bring its plan to fruition.

**CONCLUSION**

For the foregoing reasons, we hold that the district court erred in denying the Defendant's motion to dismiss. We VACATE the order of the district court and REMAND this matter with instructions that it be DISMISSED.

2000). In *Agrilectric*, the court held that a state regulatory agency is preempted under PURPA from altering the terms of wholesale contracts, but contrary to *Freehold*, holds that "regulatory-out clauses" are enforceable. *Id.*, at 304.[6]

Despite its factual similarity to the case at hand, *Agrilectric* deals with an actual, ripe case or controversy. In that case, the defendant had actually used the "regulatory out" clause to avoid performance under the contract. Here, even in the QFs' worst case scenario, such an action could not occur until 2008.

The Plaintiffs claim that the FERC regulations and the holdings in *Freehold*, *West Penn Power*, *Independent Energy Producers v. California Pub. Util. Comm'n.*, 36 F.3d 848 (9th Cir. 1994) and *Smith Cogeneration Management Inc, v. Corp. Comm'n*, 863 P.2d 1227 (Okla. 1993), "make clear that avoided cost rates and pass-through of avoided cost payments to retail customers are not to be disturbed as a result of changed circumstances in the marketplace." This claim does not take into account the clearly different facts of those cases.

As noted above, *Freehold* involved an order to renegotiate the long standing PPAs. *West Penn Power* involved a similar situation, where the regulator attempted to rewrite contract terms. *Independent Energy Producers* arose from almost identical circumstances, where the California regulators passed a rule allowing suspension of avoided cost payments and revoked the QF status of several California QFs. In *Smith Cogeneration*[7], an Oklahoma district court held that the state regulator could not review avoided costs once they were set

district court and remand this matter to the district court, with instructions to dismiss the case.

## I.

This matter arises from the Michigan Public Services Commission's ("MPSC") appeal of the district court's decision interpreting a series of MPSC orders. In 1997, in preparation for deregulation of the electric industry, the MPSC issued a series of orders dealing with the recovery of "stranded costs." The plaintiffs, a group of electric power generators, requested clarification of certain MPSC orders with regard to how the orders would affect their rights under contracts they had entered into pursuant to a federal statute. The MPSC then issued additional orders stating that the previous orders did not, and were not intended to, affect the rights of any parties under the power purchase agreements. The plaintiffs brought suit in federal district court seeking a declaratory judgment to determine the effect that the MPSC orders had on their contract rights. The district court denied the MPSC's motion to dismiss for lack of a case or controversy and granted summary judgment for the power producers, holding that "to the extent that" the MPSC orders infringed upon their contract rights, the orders were void. The MPSC filed a timely appeal to this court.

The Public Utilities Regulatory Policies Act of 1978 ("PURPA") was enacted as part of the National Energy Act in response to the energy crisis of the 1970s. Congress sought to lessen the dependence of electric utilities on fossil fuels by encouraging the development of alternative power sources in the form of "cogeneration facilities," which create several forms of energy, for example, electricity and "steam or other forms of useful energy which are useful for industrial, commercial, heating or cooling purposes," and small power production facilities. 16 U.S.C. § 796(18)(A). Section 210(a) of PURPA directs the Federal Energy Regulatory Commission (FERC) to promulgate rules to encourage the development of alternative sources of power, including rules

---

[6] For plaintiffs here to rely on this argument is somewhat circular because the *Agrilectric* court cites the district court's opinion in the instant case for the implicit proposition that regulatory out clauses are enforceable.

[7] *Smith* is the only case cited to imply that the regulator is required by PURPA to approve the pass-through of avoided costs to ratepayers.

requiring utilities to buy electricity from statutorily defined qualifying facilities ("QFs") and requiring the setting of rates that are just and reasonable to ratepayers.[1]  The price paid by the utility for this power is not to exceed the cost—called in the statute the "incremental cost of alternative electric energy"—the utility would incur in generating the electricity itself or in purchasing it from a non-QF generator.  *See* 16 U.S.C. § 824a-3(b).  In the regulations promulgated under the statute, this cost is called the  "avoided cost."[2]

Transactions under PURPA are structured as follows:  The transmitting utility contracts to purchase power from a QF at a cost not to exceed the cost the utility would incur to generate or purchase the power from a non-QF generator. That "avoided cost," which the transmitting utility would have incurred in generating the power itself, is built into customers' rates with the approval of the relevant state regulator (in this case the MPSC).  Thus, the QF is guaranteed a certain level of sales, the utility essentially buys the QF power for what it would have cost the utility to generate the power itself, and the rate that the public pays for the power includes the "avoided cost" to the transmitting utility.  Courts have implicitly adopted the congressional rationale that what excess consumers might pay in terms of passed-through avoided costs[3] is offset by the general public good of

---

[1] To avoid confusion, the term "utility" as used in this opinion means a large generator/transmitter of power which serves as the point of sale/transmission to consumers.  A "QF" is one of the smaller, eco-friendly electric generators selected for special treatment under PURPA.

[2] "Avoided costs" are defined as the incremental costs to an electrical utility of energy or capacity that but for the purchase from the qualifying facility or facilities, such utility would generate itself or purchase from another source.  18 C.F.R. § 292.101(b)(6).

[3] Such excess would occur, for example, where the QF was able to produce the power at less than the avoided cost, but, through the terms of its contract with the utility, was entitled to payment in the amount of the

In seeking to establish the existence of a case or controversy, the QFs rely heavily on the Third Circuit's opinion in *Freehold Cogeneration Assoc., L.P. v. Board of Regulatory Commissioners of New Jersey*, 44 F.3d 1178 (3rd Cir. 1995), *cert. denied sub nom., Jersey Central Power & Light Co. v. Freehold Cogeneration Assoc., L.P.*, 516 U.S. 815 (1995).  This reliance is misplaced, as the cases are easily distinguishable.  In *Freehold*, the state utilities commission ordered that the QFs and the utilities renegotiate their PPAs in the wake of deregulation.  This order essentially voided the existing contracts and clearly created an immediate controversy.  The Third Circuit held that the "regulatory out" clauses in those contracts violated PURPA, and were thus unenforceable.  In the instant case, the MPSC has disavowed any intent to interfere in the contractual relationships established under PURPA.

As we have already noted, in its order of October 29, 1997, the MPSC said:

The qualifying facilities have confused the recovery of stranded costs and the enforcement of their power purchase agreements.  There is nothing in the true-up mechanism that affects the rights of MCV or any qualifying facility.  To the extent the qualifying facilities have enforceable contracts, the utilities remain obligated to honor the contracts and remain free to seek recovery of those costs from ratepayers.  Neither approval for the utilities to recover stranded costs nor approval of a true-up mechanism changes the rights of qualifying facilities. The Commission therefore concludes that it need not address concerns about recovery of costs beyond 2007.

MPSC Case No. U11454, Opinion and Order, pp 15-16 (October 29, 1997).

The Fifth Circuit recently addressed the question of avoided costs in a deregulated world in *Agrilectric Power Partners, Ltd., v. Entergy Gulf States, Inc.*, 207 F.3d 301 (5th Cir.

Further, we can find no adverse legal interests that exist between the parties. The MPSC is a state regulatory body whose only legal interest in the current regulatory context is to ensure that rates are "fair and reasonable." The MPSC is charged under PURPA with implementing and upholding the PPAs. The MPSC has taken no action contrary any of the QFs' interests, and in fact, it has attempted on several occasions to reassure the QFs that the orders do not prohibit the QFs from exercising their rights to enforce those contracts.

The QFs base their claim not on what the MPSC has done, but rather on what it has not done. The MPSC has declined to address the question of whether after 2007 the QFs can recover their contract price through the ratemaking process. The essence of this dispute is not *whether* the QFs will be paid on their contracts, but *how* they will be paid on their contracts. The QFs would obviously rather lock in a guaranteed revenue stream from the ratepayers now. Required payments from consumers pursuant to a Commission order clearly provides more security than a mere contract with a utility operating in a free market. Also, some utilities are better positioned for deregulation than others. Some utilities may not survive the transition, or may emerge as significantly scaled- down operations. By insisting on receiving guaranteed payments from the ratepayers, the QFs are attempting to pound a square peg of the old monopoly system into the round hole of the emerging free market.

---

incurred any immediate harm from the MPSC orders. Rather, the parties simply disagree about what price ought to be assigned to the value of the contracts in a changing and inherently uncertain future marketplace.

The scant evidence regarding sale of contracts indicates that any negotiations that occurred were merely preliminary, and no parties had executed any agreements that might have subjected them to an immediate loss. Further, there is no "specific relief" that this court could offer Commonwealth to remedy Consumers unwillingness to buy out the contracts at Commonwealth's preferred price. Even if we granted the declaratory judgment the plaintiffs seek, Consumers might balk at the price requested, or simply choose not to purchase the power agreements.

---

developing alternative energy sources. *See American Paper Institute v. American Electric Power Service Corporation*, 461 U.S. 402, 413-414 (1983).

To further encourage these alternative power sources, PURPA also reduced the regulatory burden on QFs. *See FERC v. Mississippi*, 456 U.S. 742 (1982). PURPA requires the FERC to promulgate regulations exempting QFs from most federal regulations and "state laws and regulations respecting the rates, . . . of electrical utilities." 16 U.S.C. § 824a-3(e)(1).

This regulatory landscape changed when Congress enacted the Energy Policy Act of 1992. *See* 16 U.S.C. §§ 824j, 824k. This act gave the FERC authority to promulgate regulations opening the wholesale electrical market, paving the way for complete deregulation and competition. The Energy Policy Act of 1992 did not amend or repeal the provisions of PURPA requiring utilities to purchase power from QFs at the "full avoided cost." *See West Penn Power Co. v. Pennsylvania Public Utility Commission*, 659 A.2d 1055, 1058 (1995). However, this move towards competition created the new issue of "stranded costs." "Stranded investment represents that portion of capacity which has capital costs and operating costs so great that the power is produced at a cost that will not be competitive in the coming competitive marketplace . . . ." *Id.* Stranded costs are the portion of that stranded investment that may be passed on to ratepayers to compensate the utility for stranded investment undertaken because of regulatory requirements. The question left for states to answer is to what extent "avoided costs" are recoverable as "stranded costs."

---

avoided cost. In that circumstance, the QF would make a profit, the utility would pay no more than what it would have cost the utility to produce the power itself (or to purchase it from a non-QF), but the consumer would obtain no benefit from the lower actual cost.

Beginning in January of 1996, the MPSC began to issue orders to create a framework for the restructuring of the electric utility industry in Michigan.  The Commission held public meetings and accepted public comments throughout the process.  On June 5, 1997, the MPSC issued an order detailing its plan for deregulating the industry.  The plan phases in customer choice of electricity providers, allowing choice for all customers by 2004.  The order permits utilities to collect "stranded costs" through the year 2007.  Recovery of stranded costs is essentially remuneration for investment undertaken pursuant to regulatory requirements.  Under the old regime, utilities invested and submitted to regulatory rate control in exchange for monopoly status.  As their monopoly status is revoked, the utility transmitters are allowed some recovery of this investment.

The MPSC limited the recovery of stranded costs to five categories:  (1) regulatory assets, (2) capital costs of nuclear plants, (3) contract capacity costs arising from power purchase agreements, (4) employee retraining costs, and (5) costs related to implementing restructuring.    On October 29, 1997, the MPSC issued more orders regarding the collection of stranded costs, stating that "[c]ustomers who choose to continue as full-service customers of the utilities will continue to pay those costs in their bundled rates. Customers who choose to obtain generation services elsewhere will pay those stranded costs for their continued use of the distribution system."  MPSC Case No. U-11454. Opinion and Order, p. 6 (October 29, 1997).  The order also stated that the MPSC would implement a "true-up mechanism" to prevent over-collection or under-collection of stranded costs as the new market forms.  *Id.*

During the public comment period, one of the QFs (Midland Cogeneration Venture, a plaintiff in this case) argued that the "true-up mechanism" must provide for full recovery of the QFs' contracts throughout the life of those contracts.

The qualification, "to the extent that," demonstrates a lack of conclusiveness.  Any potential violation of PURPA does not actually occur unless or until a utility breaches a PPA.

The district court opinion merely expresses a truism that is undisputed by the parties.  The MPSC acknowledges that an attempt to avoid the PPAs through the "regulatory out" clause would fail.  In its Reply Brief, the MPSC states:

> [Plaintiffs'] briefs argue that because the contracts with the utilities contain "regulatory out clauses" they are harmed by the challenged Commission orders. However, since PURPA requires that the utility must buy power from a QF at its avoided cost rates as determined by the state commission, and since the utility must be provided recovery of these costs from its ratepayers, the Commission is legally constrained from disallowing its previously approved QF rates.  Hence, no regulatory-out clause will become operative.

Assuming arguendo that the MPSC disallowed a pass through of "avoided costs" (from the purchasing distributor utility to ratepayers), the utility would still be bound by the PPA to purchase power at the agreed-upon rate.  Such an action by the MPSC might violate PURPA, and result in a cause of action for both the QF and the utility.  However, that has not happened in this case, and plaintiffs have produced no evidence to indicate that the MPSC has threatened or is likely to take such action.[5]

---

[5]The only evidence that hints at the existence of a current justiciable case or controversy is the affidavit presented by Plaintiff Commonwealth Power.  The affidavit indicates that utility Consumers Energy Company had made inquiries to Commonwealth regarding Commonwealth's interest in selling or restructuring its existing power purchase agreements.  The affidavit also shows that Consumers was apparently unwilling to pay the price Commonwealth would demand for a buy or restructuring. Although this exchange evidences that some parties contemplated selling their contracts, the mere fact that Consumers is unwilling to pay what Commonwealth asks does not demonstrate that Commonwealth has

contracts.[4]   The authority cited by both parties suggests it would not. *See Freehold Cogeneration Assoc., L.P. v. Board of Regulatory Commissioners of New Jersey*, 44 F.3d 1178, 1193 (3rd Cir. 1995), *cert. denied sub nom., Jersey Central Power & Light Co. v. Freehold Cogeneration Assoc., L.P.*, 516 U.S. 815 (1995), *but see Agrilectric Power Partners, Ltd., v. Entergy Gulf States, Inc.*, 207 F.3d 301 (5th Cir. 2000) (citing the district court's opinion in the instant case for the proposition that the "regulatory-out clauses" are enforceable).

Assuming all these stars align, the QFs may well face a justiciable controversy after the year 2007.  But at this time, any controversy is hypothetical.  It is telling that the plaintiff's complaint is phrased largely in the subjunctive, *e.g.* "*[i]f* the MPSC orders' subject the Plaintiffs to rate regulation, *then* the orders violate PURPA, . . .*"* J.A. at 47. (*emphasis added*).

Second, it is not clear what type of conclusive judgment we could render in this potential dispute.  The district court order offers no specific relief, mirroring the tentative language of the complaint.  The district court held:

> The Michigan Public Service Commission's ("MPSC") orders of June 5, 1997, October 29, 1997, January 14, 1998 and February 11, 1998, (collectively the "Restructuring Orders"), are preempted by PURPA and the Supremacy Clause of the United States Constitution *to the extent that* they prohibit any utility from recovery from its customers any charge for avoided costs (or "stranded costs") to be paid to Plaintiffs as qualifying facilities under PURPA pursuant to power purchase agreements ("PPA") between such utilities and Plaintiffs." 75 F. Supp.2d 804 (W.D. Mich., 1999), 1999 WL 1006482, at * 1 (W.D. Mich.) (*emphasis added*).

---

[4] Generally, a "regulatory out clause" is a provision contained in a power purchase agreement that permits a utility to modify the contractual rates if changes in the regulatory environment impair the ability of the utility fully to recover payment from consumers in a timely manner.

The MPSC addressed this concern in its October 29, 1997, order saying:

> The qualifying facilities have confused the recovery of stranded costs and the enforcement of power purchase agreements.  There is nothing in the true-up mechanism that affects the rights of the MCV or any qualifying facility.  To the extent the qualifying facilities have enforceable contracts, the utilities remain obligated to honor the contracts and remain free to seek recovery of those costs from ratepayers.  Neither approval for the utilities to recover stranded costs nor approval of a true-up mechanism changes the rights of the qualifying facilities.  The Commission therefore concludes that it need not address concerns about recovery of costs beyond 2007.  MPSC Case No. U-11454, Opinion and Order, pp. 15-16 (October 29, 1997).

Concerned over the utilities' ability to collect the "avoided costs" through the stranded cost mechanism, and subsequently make good on the power purchase agreements (PPAs), the QFs requested a rehearing of the October 29, 1997 orders.  After rehearing, the Commission issued an order on January 14, 1998, reiterating its previous conclusions.  The QFs then asked for clarification regarding how the stranded cost collection and the true-up provisions would affect their PPA contracts.  The MPSC responded on February 11, 1998, stating "the Commission did not, nor did it intend to, modify charges in power purchase agreements" and reiterated statements from its prior orders.  The MPSC also noted that "the concerns raised [by plaintiffs] are speculative because they are based entirely upon the conjecture that their contractual prices will exceed the market price for power in 2008 and beyond."  Still skeptical, the QFs filed appeals that are currently pending in the Michigan Court of Appeals, and in federal district court.

The district court found that a case or controversy existed holding:

"If such an interpretation [*i.e.* plaintiffs' interpretation] is correct Plaintiffs will face the prospect of losing large sums of their avoided cost rates set forth in their PPAs. In this Court's judgment, merely facing such losses is a current injury because a sure thing has more value to an investor and potential investor than an uncertain thing. Furthermore, although the threatened injury may not occur for several years, the uncertainty is a current injury to Plaintiffs' value."

41 F. Supp. 2d 742-743.

The district court also held that the MPSC orders are "preempted by PURPA and the Supremacy Clause of the United States Constitution to the extent that they prohibit any utility from recovering from its customers any charge for avoided costs (or "stranded costs") to be paid to Plaintiffs as qualifying facilities under PURPA." *Id.*, at 804. The MPSC has filed a timely appeal to this court.

## II.

One of the fundamental axioms of American jurisprudence is that a federal court may consider only actual cases or controversies. *See* U.S. Const., art. 3, sec. 2, clause 1; *see also, Babbitt v. Farm Workers National Union*, 442 U.S. 289 (1979), *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227 (1937). The threshold issue this court must determine here is whether an actual case or controversy exists for adjudication, a question we review de novo. *National Rifle Association of America v. Magaw*, 132 F.3d 272, 278-279 (6th Cir. 1997). In determining whether a case or controversy exists, the Supreme Court has taught:

The difference between an abstract question and a "case or controversy" is one of degree, of course, and is not discernible by any precise test. The basic inquiry is whether the "conflicting contentions of the parties . . . present a real, substantial controversy between the parties

having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract."

*Babbitt v. Farm Workers National Union*, 442 U.S. 289, 297-298 (1979) (internal citations omitted.)

In interpreting the Declaratory Judgment Act, the Court stated:

A 'controversy' in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240-241 (1937) (internal citations omitted).

Applying these principles to the situation at hand, we do not find an actual controversy. First, the parties' dispute is hypothetical at this point in time. The plaintiffs' claims are premised on speculation about how an order might be interpreted seven years from now by a future MPSC. Even assuming that some future commission interpreted the order to disallow the avoided costs and applied a market test, as plaintiffs fear, the plaintiffs would suffer no injury unless the market price fell below the qualifying facilities' contract prices. Even then, it is not clear whether "regulatory out" clauses in these contracts would operate to void the