NORTH AMERICAN NATURAL RESOURCES, INC., et al., Plaintiffs,

v.

MICHIGAN PUBLIC SERVICE COMM'N, et al., Defendants.

Midland Cogeneration Venture Limited Partnership, Plaintiffs,

v.

Michigan Public Service Comm'n, et al., Defendants.

Michigan Power Limited Partnership and ADA Cogeneration Limited Partnership, Plaintiff,

v.

Michigan Public Service Comm'n, et al., Defendants.

Central Wayne Energy Recovery Limited Partnership, Plaintiff,

v.

Michigan Public Service Comm'n, et al., Defendants.

Nos. 5:98–CV–21, 5:98–CV–22, 5:98–CV–23, 5:98–CV–24.

United States District Court, W.D. Michigan, Southern Division.

Nov. 24, 1998.

Thomas J. Waters, Fraser, Trebilcock, Davis & Foster, PC, Lansing, MI, for North American Natural Resources, Inc., Commonwealth Power Co., Hubbardston Hydro Co., Cadillac Renewable Energy, LLC, Granger Elec. Co., Adrian Energy Associates, LLC, Michigan Cogeneration Systems, Inc., Sumpter Energy Assoc., Ltd. Partnership, Riverview Energy Systems Partnership, Inc., Viking Energy of Lincoln, Inc., Viking Energy of McBain, Inc., Grayling Generating Station Ltd. Partnership, Hillman Power Co., LLC, Genesee Power Station, LP, Charter Township of Ypsilanti.

Patricia S. Barone, Assistant Atty. Gen., David A. Voges, Assist. Atty. Gen., Jennifer M. Granholm, Atty. General, Public Service Div., Lansing, MI, for Michigan Public Service Com'n, John G. Strand, John C. Shea, David A. Svanda.

Stephen O. Schultz, Foster, Swift, Collins & Smith, PC, lansing, MI, for Midland Cogeneration Venture Ltd. Partnership.

David E.S. Marvin, Fraser, Trebilcock, Davis & Foster, PC, Lansing, MI, for Michigan Power Ltd. Partnership.

## OPINION

QUIST, District Judge.

The Plaintiffs in these consolidated cases own and operate electric cogeneration facilities which are "qualifying facilities" ("QF") under the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. §§ 824–824k.[1] Plaintiffs filed their complaints against Defendants seeking a declaration that certain orders issued by the Michigan Public Service Commission ("MPSC") are in conflict with and violate PURPA. Plaintiffs in case nos. 5:98–CV–21 and 5:98–CV–22 also seek declaratory relief based upon Defendants' alleged violation of Plaintiffs' due process rights under the Fourteenth Amendment. Defendants have moved for dismissal of Plaintiffs' complaints pursuant to Fed. R.Civ.P. 12 on several grounds, including Eleventh Amendment immunity and abstention. The parties have submitted briefs on the issue. For the reasons stated below, Defendants' motions will be denied.

### Overview of PURPA

Under the Federal Power Act ("FPA"), 16 U.S.C. § 791a – 825u, any person who owns or operates facilities used to transmit or sell electric energy in interstate commerce at wholesale is subject to the jurisdiction and regulatory power of the Federal Energy Regulatory Commission ("FERC"). See 16 U.S.C. § 824. In 1978, Congress modified the FPA by enacting PURPA[2] as part of a comprehensive package of energy legislation in response to the nationwide energy crisis. See FERC v. Mississippi, 456 U.S. 742, 745, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982); Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 94 (2d Cir.1996). Among other things, "PURPA is intended to control power generation costs and ensure long-term economic growth by reducing the nation's reliance on oil and gas and increasing the use of more abundant, domestically produced fuels." Freehold Cogeneration Assocs., L.P. v. Board of Regulatory Comm'rs of New Jersey, 44 F.3d 1178, 1182 (3d Cir.1995). Section 210 of PURPA reflects Congress' policy of re-

---

1. Under the Federal Power Act, a "cogeneration facility" is a facility which produces electric energy and steam or forms of useful energy which are used for industrial, commercial, heating, or cooling purposes. See 16 U.S.C. § 796(18)(A). A "qualifying cogeneration facility" is a cogeneration facility which meets the requirements set by the Federal Energy Regulation Commission and is owned by a person not primarily engaged in the generation or sale of electric power. See 16 U.S.C. § 796(18)(B).

2. With the perceived energy crises now arguably under control, PURPA has been described as " 'the solution that won't die for the problem that did.' " New Charleston Power I, L.P. v. FERC, 56 F.3d 1430, 1431 (D.C.Cir.1995) (quoting Jeff Bailey, 'Purpa' Power, Wall St.J., May 17, 1995, at A1).

quiring utility companies to sell electric energy to, and buy electric energy from, nontraditional electric producing facilities.

Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels. But it also felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development.

In order to overcome the first of these perceived problems, § 210(a) directs FERC, in consultation with state regulatory authorities, to promulgate "such rules as it determines necessary to encourage cogeneration and small power production," including rules requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities....

To solve the second problem perceived by Congress, § 210(e), 16 U.S.C. § 824a–3(e), directs FERC to prescribe rules exempting the favored cogeneration and small power facilities from certain state and federal laws governing electricity utilities.

*FERC v. Mississippi,* 456 U.S. at 750–51, 102 S.Ct. at 2132–33.

Pursuant to § 210(b) and the regulations implemented by FERC, utilities must purchase electricity from qualifying facilities ("QF") at rates which are "just and reasonable to the electric utility and in the public interest" and which do "not discriminate against" QFs. 16 U.S.C. § 824a–3(b); 18 C.F.R. § 292.304(a)(1)(i), (ii). The FERC regulations require a utility to purchase electricity from a QF at the utility's "avoided cost," which is defined as "the incremental costs to an electric utility of electric energy or capacity or both which,

but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. §§ 292.101(b)(6), .304(a)(2). In addition, the FERC's rules exempt QFs from certain state laws and regulations, including state law governing the rates of electric utilities. *See* 18 C.F.R. § 292.602.

The FERC regulations permit a QF to either provide energy as the QF determines energy to be available for purchases, or to enter into an enforceable contract for the delivery of energy over a specified term. *See* 18 C.F.R. § 292.304(d). If a QF chooses the latter option, the QF may elect to set the rates based upon the utility's avoided costs either at the time of delivery or at the time the QF incurs its obligation to deliver energy, i.e., up-front. *See id.* § 292.304(d)(2); *Independent Energy Producers v. California Pub. Utils. Comm'n,* 36 F.3d 848, 851–52 (9th Cir.1994).

State regulatory authorities such as the MPSC are required to implement PURPA pursuant to the rules and regulations promulgated by FERC. *See* 16 U.S.C. § 824a–3(f). A state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and QFs. *See Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.,* 159 F.3d 129, 135 (3d Cir.1998) ("Though PURPA does limit the authority of state agencies in some respects, e.g., by exempting cogeneration facilities from some regulation, PURPA still provides a substantial role to state agencies in regulating energy contracts between utilities and cogenerators"); *Independent Energy Producers,* 36 F.3d at 856 (noting that "[t]he state's authority to implement section 210 is admittedly broad"). While states do play a substantial role in implementing PURPA and approving contracts between utilities and QFs, once a state regulatory commission establishes the "avoided cost" to be paid, the state no longer has authority to regulate the QF's rate. *See Freehold,* 44 F.3d

at 1191–92; *cf. Independent Energy Producers*, 36 F.3d at 858 (finding that variances in anticipated fuel prices did not give the state and the utilities the right to unilaterally alter the purchase contract because under federal regulations "QFs are entitled to deliver energy to utilities at an avoided cost rate calculated at the time the contract is signed").

### Facts

Each Plaintiff in this case has entered into a long-term Power Purchase Agreement ("PPA") with either Consumers Power Company or Detroit Edison to supply electric power at "avoided cost" rates as required by PURPA. Plaintiffs elected to have the utilities' avoided costs determined as of the time they entered into the PPAs. Defendant MPSC approved Plaintiffs' PPAs.

On December 19, 1996, the MPSC Staff filed a report which outlined a conceptual framework for restructuring the electric utility industry in Michigan. The basic plan or the restructuring was to gradually permit all electric utility customers to choose their own suppliers of power, such as Plaintiffs, although the electric utilities would continue to distribute or transmit the power to consumers. Following a series of hearings, the MPSC issued orders dated June 5, 1997, and October 29, 1997, which provided for the restructuring in the service territories of Consumers and Detroit Edison. Among other things, the orders provided that certain QF avoided costs would be classified as "stranded costs"[3] for purposes of recovery by utilities through retail rates and that the last day for utilities to collect "stranded costs" would be December 31, 2007.

Various parties that were dissatisfied with the October 29, 1997, order filed petitions for rehearing. In its Rehearing on Restructuring Order, issued January 14, 1998, the MPSC confirmed that the last day for collecting stranded costs was December 31, 2007. Interpreting the orders as preventing Consumers and Detroit Edison from recovering the rates owed to Plaintiffs after the year 2007, certain Plaintiffs in this case filed petitions to intervene before the MPSC seeking clarification that the orders did not impact Plaintiffs' rights under their PPAs by precluding the utilities from collecting their "stranded costs" beyond the year 2007. On February 11, 1998, the MPSC issued an order in response to the petitions to intervene and motions for clarification, in which the MPSC stated that its orders had not modified the rates in Plaintiffs' PPAs. However, the orders did not clarify whether the restructuring orders interfere with Consumers' or Detroit Edison's rights to recover the rates in the PPAs after the year 2007. Plaintiffs appealed the orders under state law to the Michigan Court of Appeals.

Plaintiffs filed these actions seeking declarations that the MPSC's restructuring orders violate their rights under PURPA. Plaintiffs allege that if the orders can be interpreted as disallowing recovery of the QFs' avoided cost rates after the year 2007, the "regulatory out" clauses[4] in their PPAs will permit Consumers and Detroit Edison to reduce their payments to Plaintiffs which, in turn, will cause Plaintiffs substantial financial losses.

### Standard for Dismissal

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed.

---

3. Also known as "transition costs," "stranded costs" include utility companies' costs that were incurred prior to deregulation that are above market prices during deregulation and costs incurred in the transition from monopoly status to competitive market status. (*See* Pls.' Br. Opp'n (no. 5:98–CV–21) Ex. A at 12.)

4. A "regulatory-out" clause provides for renegotiation of rates or termination of the purchase contract in the event a judicial, administrative, or other governmental agency takes some action that impairs the utility's ability to recover its costs from ratepayers. *See Freehold*, 44 F.3d at 1193 n. 12.

R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993) (citing *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. 2A James W. Moore, *Moore's Federal Practice*, ¶ 12.34[1][b] (3d ed.1997). The Court need not, however, accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

### Discussion

### I. Eleventh Amendment Immunity

The Defendants' raise the argument that the suit against them is barred by sovereign immunity under the Eleventh Amendment. Under the state sovereign immunity doctrine, in the absence of consent to suit or a waiver of immunity, the Eleventh Amendment shields a state from suit in federal court, regardless of the type of relief sought. *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144, 113 S.Ct. 684, 687–88, 121 L.Ed.2d 605 (1993) (citing, among others, *Cory v. White*, 457 U.S. 85, 90–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). A suit brought against a state official is also barred by the Eleventh Amendment if the state is the real party in interest. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). The

MPSC is a state agency that is entitled to the immunity afforded the state under the Eleventh Amendment. *See ANR Pipeline Co. v. Michigan Pub. Serv. Comm'n*, 608 F.Supp. 43, 47 (W.D.Mich.1984).

The Eleventh Amendment does not bar Plaintiffs' claims against the MPSC Commissioners in their official capacities because they come within the exception set forth in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). In *Ex Parte Young*, the Court held that where a state officer's actions are violating or will violate federal law, those actions are outside the state's authority and "[t]he state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id.* at 160, 28 S.Ct. at 454. Under this exception to immunity, jurisdiction exists for prospective injunctive relief to enjoin ongoing violations by state officials of federal law. *See Seminole Tribe v. Florida*, 517 U.S. 44, 73, 116 S.Ct. 1114, 1132, 134 L.Ed.2d 252 (1996).

Plaintiffs contend that their requests for declaratory and injunctive relief involve a "garden variety" application of the *Ex Parte Young* doctrine because Plaintiffs seek prospective relief preventing Defendants from violating federal law. The Court agrees with Plaintiffs. In *ANR Pipeline*, the court stated that "while the MPSC itself is immune from suit under section 1983 ... [t]he addition of the individual commissioners as defendants adds parties who do not enjoy the same eleventh amendment immunity as the MPSC." *ANR Pipeline*, 608 F.Supp. at 47. The court concluded that because the plaintiff's claim challenged the constitutionality of the commissioners' actions, the individual commissioners were proper defendants under the *Ex Parte Young* exception to Eleventh Amendment immunity. *See id.* In a more recent case from this district, *Michigan Bell Telephone Co. v. MFS Intelenet of Michigan, Inc.*, 16 F.Supp.2d 817 (W.D.Mich.1998), Judge Enslen rejected

an Eleventh Amendment claim by the MPSC commissioners in connection with a claim under the Telecommunications Act of 1996. In discussing the application of the *Ex Parte Young* exception, Judge Enslen stated:

> Plaintiff Ameritech seeks an order enjoining the Commissioners from enforcing an Order which Plaintiff alleges violates federal law. Such enforcement constitutes an "ongoing violation" and the relief sought is clearly prospective despite the fact that the Order involves monetary relief. Consequently, this Court, like the many courts cited below, holds that *Ex parte Young* applies in the instant case to permit this suit to proceed.

*Id.* at 826.

Defendants have not raised any compelling argument why the *Ex Parte Young* exception does not apply in this case, nor does the Court find any basis for concluding that the doctrine is not applicable in this case. Therefore Defendants' Eleventh Amendment argument with respect to the Commissioners is rejected.

## II. Case or Controversy Requirement

Defendants also contend that Plaintiffs' complaints should be dismissed because there is no case or controversy as required by Article III, Section 2, Clause 1 of the United States Constitution and by the Declaratory Judgment Act, 28 U.S.C. § 2201. Defendants argue that Plaintiffs' claims demonstrate no actual harm because they "merely speculate[ ] about what unlawful interpretation might occur as a result of the Commission's electric rate restructuring orders." (Defs.' Br. at 14–15.) In addition, Defendants contend that the

MPSC said in its February 11, 1998, order that its restructuring orders do not affect the rates in Plaintiffs' PPAs.

 It is well established that a plaintiff who seeks declaratory relief "must demonstrate actual present harm or a significant possibility of future harm to justify pre-enforcement relief." *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir.1998). Although declaratory judgment actions are typically sought before an injury has occurred, a declaratory judgment may only be rendered in a case of " 'actual controversy.' " *National Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir.1997). However, a plaintiff need not "await the consummation of threatened injury to obtain preventive relief. Rather, if the injury is certainly impending, that is sufficient." *Peoples Rights Org.*, 152 F.3d at 527. The "case or controversy" requirement is met in a declaratory judgment action if the claim presents " '(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution.' " *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir.1995) (quoting *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 411 (3rd Cir.1992)).

 Plaintiffs' claims for declaratory relief present an actual controversy for adjudication. Plaintiffs allege that the restructuring orders can be interpreted as prohibiting Consumers and Detroit Edison from recovering a portion of their stranded costs beyond the year 2007. If such an interpretation is correct[5], Plaintiffs will

---

5. Plaintiffs have presented evidence that Consumers and an association of industrial energy users known as the Association of Businesses Advocating Tariff Equity ("ABATE") has interpreted the restructuring orders in such a manner. (*See* Letter of 3/26/98 from Consumers, Pls.' Br. (case no. 5:98–CV–21) Ex. F.) At oral argument Defendants' counsel furnished copies of portions of the briefs filed

by Consumers and ABATE in the state court of appeals proceeding and argued that the excerpts show that Consumers and ABATE do not view the MPSC orders as precluding recovery of costs associated with the PPAs after 2007. Based upon its review of the brief excerpts and other documents submitted by Plaintiffs, it is obvious that Consumers and ABATE both interpret the orders in the same

face the prospect of losing large sums of their avoided cost rates set forth in their PPAs. In this Court's judgment, merely facing such losses is a current injury because a sure thing has more value to an investor and potential investor than an uncertain thing. Furthermore, although the threatened injury may not occur for several years, the uncertainty is a current injury to Plaintiffs' value.

Defendants' argument that the orders do not violate PURPA because the MPSC said in its orders that it "has not done so" is unavailing. Plaintiffs contend that the effect of the MPSC's restriction on recovery of "stranded costs" after 2007 will be to reduce the avoided cost rate that Plaintiffs are entitled to receive under their PPAs. Plaintiffs' claim is not foreclosed simply because Defendants take the position that their actions do not violate PURPA. Therefore, Defendants "no case or controversy" argument lacks merit. Plaintiffs' claim for declaratory relief presents an actual controversy that can be resolved by judicial resolution.

## III. Abstention

Defendants argue that the Court should abstain in this case under the abstention doctrines adopted by the Supreme Court in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Federal courts have "a 'virtually unflagging obligation' to exercise their jurisdiction." *Deakins v. Monaghan*, 484 U.S. 193, 203, 108 S.Ct. 523, 530, 98 L.Ed.2d 529 (1988) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976)). "Abstention from the exercise of federal jurisdiction is the exception, not

the rule." *Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244.

■ *Younger* abstention "espouse[s] a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). The requirements for *Younger* abstention are: (i) an ongoing state judicial proceeding; (ii) implication of important state interests; and (iii) an adequate opportunity in the state proceedings to raise constitutional challenges. *See id.* at 432, 102 S.Ct. at 2521.

■ *Younger* abstention is inappropriate in these cases for several reasons. First, while the issues raised by Plaintiffs in these cases are no doubt of concern to the state, they implicate issues arising solely under a federal statute, PURPA. In other words, the central issue in these cases is whether the MPSC's orders are in conflict with PURPA. *Younger* abstention is also inappropriate because there is no indication that a determination in this case will interfere with the state court of appeals proceeding which is not addressing the federal law issues raised in these cases. *See Marks v. Stinson*, 19 F.3d 873, 882 (3d Cir.1994) (noting that "[a] federal court will only consider *Younger* abstention when the requested equitable relief would constitute federal interference in state judicial or quasi-judicial proceedings"). Finally, abstention is inappropriate under the Supreme Court's decision in *New Orleans Public Service, Inc. v. Council of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) ("NOPSI"), in which the Court observed that "it has never been suggested that Younger requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the

manner as Plaintiffs. In light of the fact that those parties' economic interests are different than, and perhaps opposed to, Plaintiffs' economic interests, it is not surprising that they would not hoist Plaintiffs' banner before the state court.

rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *Id.* at 368, 109 S.Ct. at 2518. Here, as in *NOPSI,* in issuing the restructuring orders, the MPSC was acting in a legislative function. Thus, "[s]ince the state-court review is not an extension of the legislative process," Plaintiffs' claims were "ripe for federal review when the [MPSC's] order was entered." *Id.* at 372, 109 S.Ct. at 2520.

Abstention under the *Pullman* doctrine is appropriate " 'where a state law is being challenged in federal court as contrary to the federal Constitution and there are questions of state law which may be dispositive of the case.' " *Adams Outdoor Adver., Inc. v. City of Holland,* 883 F.Supp. 207, 208 (W.D.Mich.1995) (quoting *Martin–Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 563 (6th Cir.1982)). Defendants have failed to demonstrate a sufficient basis for *Pullman* abstention. *Pullman* abstention requires: (1) an unclear state law; and (2) likelihood that a decision by a state court on the state law will obviate the need for the federal court to decide the federal question. *See Tyler v. Collins,* 709 F.2d 1106, 1108 (6th Cir.1983). The Court in these cases is not confronted with an unclear state law. Thus, the *Pullman* abstention doctrine does not apply.

The Supreme Court summarized the principles of *Burford* abstention in *NOPSI* as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

*NOPSI* 491 U.S. at 361, 109 S.Ct. at 2514 (quoting *Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1245). There is no need for *Burford* abstention in these cases because the issues raised do not necessarily implicate a complex state regulatory scheme. In *NOPSI,* the Court rejected a similar argument for *Burford* abstention, stating:

> Here, NOPSI's primary claim is that the Council is prohibited by federal law from refusing to provide reimbursement for FERC-allocated wholesale costs. Unlike a claim that a state agency has misapplied its lawful authority or has failed to take into consideration or properly weigh relevant state-law factors, federal adjudication of this sort of preemption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an "essentially local problem."

*Id.* at 362, 109 S.Ct. at 2515. Similarly, Plaintiffs in these cases allege that the MPSC's orders are in conflict with PURPA and therefore invalid under federal law. Because Plaintiffs are not challenging the MPSC's orders on the basis of improper application of state law, Defendants' argument for *Burford* abstention is without merit.

The Third Circuit in *Freehold* rejected similar abstention arguments. *Freehold,* like this case, involved a claim that a state regulatory body's actions violated the plaintiff's contract rights. The court stated:

> The doctrine of discretionary abstention is predicated upon a federal policy of comity: federal courts of equity should exercise their discretionary power with proper consideration for the independence of state government in carrying out its governmental functions. In this case, however, our concern is with carrying out a federal statutory scheme promoting the development of alternative energy sources. The alleged intrusive action is not by the federal government,

but, on the contrary, by a state regulatory agency. We conclude that abstention is not appropriate in this case and does not warrant any extended discussion.

44 F.3d at 1187 n. 6. The *Freehold* court's observations are equally applicable in these cases.

## IV. Due Process Claim

█ In their final argument, Defendants contend that Plaintiffs fail to state a due process claim because ratepayers have no protected property rights in rates. This argument is devoid of merit because Plaintiffs are not asserting that their rights as ratepayers were violated. Rather, Plaintiffs contend that Defendants deprived them of their property interests in their PPAs without notice and a hearing. It is well settled that a person has a constitutionally protected property interest in a contract. *See Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 260 (6th Cir.1996).

### *Conclusion*

For the foregoing reasons, the Court will dismiss the MPSC from this case with prejudice but deny Defendants' motions in all other respects.