NORTH AMERICAN NATURAL RESOURCES, INC., et al., Plaintiffs,

v.

MICHIGAN PUBLIC SERVICE COMM'N, et al., Defendants.

Midland Cogeneration Venture Limited Partnership, Plaintiffs,

v.

Michigan Public Service Comm'n, et al., Defendants.

Michigan Power Limited Partnership and ADA Cogeneration Limited Partnership, Plaintiff,

v.

Michigan Public Service Comm'n, et al., Defendants.

Central Wayne Energy Recovery Limited Partnership, Plaintiff,

v.

Michigan Public Service Comm'n, et al. Defendants.

Nos. 5:98–CV–21, 5:98–CV–22, 5:98–CV–23 and 5:98–CV–24.

United States District Court, W.D. Michigan, Southern Division.

July 7, 1999.

Thomas J. Waters, Fraser, Trebilcock, Davis & Foster, PC, Lansing, MI, for North American Nat. Resources, Inc., Com. Power Co., Hubbardson Power Co., Cadillac Renewable Energy, LLC, Granger Elec. Co., Adrian Energy Assoc., LLC, Mich. Cogeneration Systems, Inc., Sumpter Energy Assoc., Ltd. Partnership, Riverview Energy Systems Partnership, Inc., Viking Energy of Lincoln, Inc., Viking Energy of McBain, Inc., Grayling Generating Station Ltd. Partnership, Hillman Power

Co, LLC, Genesee Power Station, LP, Ypsilanti, Charter Tp. of, Central Wayne Energy Recovery Ltd., Partnership, Plaintiffs.

Stephen O. Schultz, Foster, Swift, Collins & Smith, PC, Lansing, for Midland Cogeneration Venture Limited Partnership, Plaintiff.

David A. Voges, Asst. Atty. Gen., Jennifer M. Granholm, Attorney General, Patricia S. Barone, Assistant Atty. Gen., Assistant Attorney General, Lansing, MI, for Michigan Public Service Commission, John G. Strand, John C. Shea, David A. Svanda, Defendants.

David E.S. Marvin, Fraser, Trebilcock, Davis & Foster, PC, Lansing, MI, for Michigan Power Limited Partnership, ADA Cogeneration Limited Partnership, Plaintiffs.

### OPINION

QUIST, District Judge.

#### Background

The Plaintiffs in these consolidated cases own and operate electric cogeneration facilities which are "qualifying facilities" under the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. §§ 824–824k.[1] Plaintiffs sued Defendants, Michigan Public Service Commissioners John G. Strand, John C. Shea, and David A. Svanda, alleging that certain orders (the "Restructuring Orders") issued by the Michigan Public Service Commission ("MPSC") are in conflict with and violate PURPA and seeking declaratory and injunctive relief.[2]

Defendants previously moved to dismiss the case on the grounds that: (i) Plaintiffs' claims were barred by the Eleventh Amendment; (ii) there was no case or controversy because Plaintiffs could not demonstrate actual harm; (iii) the Court should abstain under one or more abstention doctrines; and (iv) the claims under 42 U.S.C. § 1983 failed to state a claim. In an Opinion and Order dated November 24, 1998, the Court granted and denied the motion in part. In particular, the Court determined that Plaintiffs' claims against the MPSC were barred by the Eleventh Amendment but that Plaintiffs could maintain their claims against the individual Defendants for injunctive and declaratory relief under the doctrine of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See North Am. Natural Resources, Inc. v. Michigan Pub. Serv. Comm'n*, 41 F.Supp.2d 736, 745 (W.D.Mich.1998). In addition, the Court found that Plaintiffs' claims for declaratory relief presented an actual controversy for adjudication because Plaintiffs demonstrated a real harm and had presented evidence that other parties interpreted the Restructuring Orders in the same manner as Plaintiffs. *See id.* at 742–43 and 742 n. 5. Finally, the Court rejected Defendants' abstention arguments and their argument regarding the § 1983 claims. *See id.* at 743–45.

Presently before the Court are Plaintiffs' motions for summary judgment. The instant motions address the only issues remaining for decision, namely, whether the Restructuring Orders violate Plaintiffs' rights under PURPA, and whether certain Plaintiffs are entitled to attorneys fees under 42 U.S.C. § 1988.

#### Overview of PURPA

Under the Federal Power Act ("FPA"), 16 U.S.C. § 791a—825u, any person who

---

1. Under the Federal Power Act, a "cogeneration facility" is a facility which produces electric energy and steam or forms of useful energy which are used for industrial, commercial, heating, or cooling purposes. *See* 16 U.S.C. § 796(18)(A). A "qualifying cogeneration facility" is a cogeneration facility which meets the requirements set by the Federal Energy Regulation Commission and is owned by a person not primarily engaged in the genera-

tion or sale of electric power. *See* 16 U.S.C. § 796(18)(B).

2. The Court previously dismissed the MPSC as a defendant on the grounds of Eleventh Amendment immunity. *See North Am. Natural Resources, Inc. v. Michigan Pub. Serv. Comm'n*, 41 F.Supp.2d 736, 745 (W.D.Mich. 1998).

owns or operates facilities used to transmit or sell electric energy in interstate commerce at wholesale is subject to the jurisdiction and regulatory power of the Federal Energy Regulatory Commission ("FERC"). *See* 16 U.S.C. § 824; *New England Power Co. v. New Hampshire,* 455 U.S. 331, 340, 102 S.Ct. 1096, 1101, 71 L.Ed.2d 188 (1982). In 1978, Congress modified the FPA by enacting PURPA as part of a comprehensive package of energy legislation in response to the nationwide energy crisis. *See FERC v. Mississippi,* 456 U.S. 742, 745, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982); *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 94 (2d Cir.1996). Among other things, "PURPA is intended to control power generation costs and ensure long-term economic growth by reducing the nation's reliance on oil and gas and increasing the use of more abundant, domestically produced fuels." *Freehold Cogeneration Assocs., L.P. v. Board of Regulatory Comm'rs of New Jersey,* 44 F.3d 1178, 1182 (3d Cir.1995). Section 210 of PURPA reflects Congress' policy of requiring utility companies to sell electric energy to, and buy electric energy from, nontraditional electric producing facilities.

Congress believed that increased use of these sources of energy would reduce the demand for traditional fossil fuels. But it also felt that two problems impeded the development of nontraditional generating facilities: (1) traditional electricity utilities were reluctant to purchase power from, and to sell power to, the nontraditional facilities, and (2) the regulation of these alternative energy sources by state and federal utility authorities imposed financial burdens upon the nontraditional facilities and thus discouraged their development.

In order to overcome the first of these perceived problems, § 210(a) directs FERC, in consultation with state regulatory authorities, to promulgate "such rules as it determines necessary to encourage cogeneration and small power production," including rules requiring utilities to offer to sell electricity to, and purchase electricity from, qualifying cogeneration and small power production facilities. . . .

To solve the second problem perceived by Congress, § 210(e), 16 U.S.C. § 824a–3(e), directs FERC to prescribe rules exempting the favored cogeneration and small power facilities from certain state and federal laws governing electricity utilities.

*FERC v. Mississippi,* 456 U.S. at 750–51, 102 S.Ct. at 2132–33.

Pursuant to § 210(b) and the regulations implemented by FERC, utilities must purchase electricity from qualifying facilities ("QF") at rates which are "just and reasonable to the electric utility and in the public interest" and which do "not discriminate against" QFs. 16 U.S.C. § 824a–3(b); 18 C.F.R. § 292.304(a)(1)(i), (ii). The FERC regulations require a utility to purchase electricity from a QF at the utility's "avoided cost," which is defined as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. §§ 292.101(b)(6), 292.304(a)(2). In addition, the FERC's rules exempt QFs from certain state laws and regulations, including state laws governing the rates of electric utilities. *See* 18 C.F.R. § 292.602.

The FERC regulations permit a QF to either provide energy as the QF determines energy to be available for purchases, or to enter into an enforceable contract for the delivery of energy over a specified term. *See* 18 C.F.R. § 292.304(d). If a QF chooses the latter option, the QF may elect to set the rates based upon the utility's avoided costs either at the time of delivery or at the time the QF incurs its obligation to deliver energy, i.e., up-front. *See id.* § 292.304(d)(2); *Independent Energy Producers v. California Pub. Utils. Comm'n,* 36 F.3d 848, 851–52 (9th Cir.1994). Where a QF elects to set the contract rate up front, it is entitled to receive that rate,

even if the utility's future avoided costs turn out to be lower than estimated at the time the purchase contract is signed. *See id.* at 858 (stating that "the fact that the prices for fuel, and therefore the Utilities' avoided costs, are lower than estimated, does not give the state and the Utilities the right unilaterally to modify the terms of the standard offer contract. Federal regulations provide that QFs are entitled to deliver energy to utilities at an avoided cost rate calculated at the time the contract is signed").

■ State regulatory authorities such as the MPSC are required to implement PURPA pursuant to the rules and regulations promulgated by FERC. *See* 16 U.S.C. § 824a–3(f). A state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and QFs. *See Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.,* 159 F.3d 129, 135 (3d Cir.1998) ("Though PURPA does limit the authority of state agencies in some respects, e.g., by exempting cogeneration facilities from some regulation, PURPA still provides a substantial role to state agencies in regulating energy contracts between utilities and cogenerators"); *Independent Energy Producers,* 36 F.3d at 856 (noting that "[t]he state's authority to implement section 210 is admittedly broad").

■ While states do play a substantial role in implementing PURPA and approving contracts between utilities and QFs, once a state regulatory commission establishes the "avoided cost" to be paid, the state no longer has authority to regulate the QF's rate. *See Freehold,* 44 F.3d at 1191–92; *cf. Independent Energy Producers,* 36 F.3d at 858. Thus, once a state approves an avoided cost rate in a QF's contract with a utility, the state "cannot later review the contract to reconsider avoided costs." *Smith Cogeneration Management v. Corporation Comm'n,* 863 P.2d 1227, 1240 (Okla.1993).

### Facts

Each Plaintiff in this case has entered into a long-term Power Purchase Agreement ("PPA") with either Consumers Power Company or Detroit Edison to supply electric power at "avoided cost" rates as required by PURPA. Plaintiffs elected to have the utilities' avoided costs determined as of the time they entered into the PPAs. The MPSC approved the avoided costs rates in Plaintiffs' PPAs.[3]

On December 19, 1996, the MPSC Staff filed a report which outlined a conceptual framework for restructuring the electric utility industry in Michigan. The basic plan of the restructuring was to gradually permit all electric utility customers to choose their own suppliers of power, although the electric utilities would continue to distribute or transmit the power to consumers. Following a series of hearings, the MPSC issued orders dated June 5, 1997, and October 29, 1997 (the "Restructuring Orders"), which provided for the restructuring in the service territories of Consumers and Detroit Edison. Among other things, the Restructuring Orders provided that certain QF avoided costs would be classified as "stranded costs"[4]

---

**3.** Defendants appear to argue that the MPSC has never approved the rates in Plaintiffs' PPAs. (*See* Defs.' Br. at 17.) Defendants first assert that "[t]he [MPSC] has set *an* avoided capacity or energy rate which may or may not be the rate" in Plaintiffs' PPAs, but then concede that "rates were approved on a case-by-case basis within the specific context of reviewing specific contracts between QFs and Michigan utilities." (*Id.*) The Court finds that Defendants' unsupported and ambiguous assertions are insufficient to create a genuine issue of material of fact because Defendants essentially concede that the MPSC has approved the rates in Plaintiffs' PPAs and Plaintiffs have

cited various MPSC orders showing that the MPSC did in fact approve the rates. *See In re Midland Cogeneration Venture Ltd. Partnership,* Case No. U–8871, *et al.,* at 2 (Feb. 22, 1990, MPSC Opinion and Order).

**4.** Also known as "transition costs," "stranded costs" include utility companies' costs that were incurred prior to deregulation that are above market prices during deregulation and costs incurred in the transition from monopoly status to competitive market status. (*See* Pls.' Br. Supp. (Case No. 5:98–CV–21) Ex. B at 12.)

for purposes of recovery by utilities through retail rates and that the last day for utilities to collect "stranded costs" would be December 31, 2007.

Various parties that were dissatisfied with the October 29, 1997, order filed petitions for rehearing. In its Rehearing on Restructuring Order, issued January 14, 1998, the MPSC confirmed that the last day for collecting stranded costs was December 31, 2007. Interpreting the Restructuring Orders as preventing Consumers and Detroit Edison from recovering their avoided costs from their customers after the year 2007, certain Plaintiffs in this case filed petitions to intervene before the MPSC seeking clarification that the orders did not impact Plaintiffs' rights under their PPAs by precluding the utilities from collecting their "stranded costs" beyond the year 2007. On February 11, 1998, the MPSC issued an order in response to the petitions to intervene and motions for clarification, in which the MPSC stated that its orders had not modified the rates in Plaintiffs' PPAs. However, the orders did not clarify whether the restructuring orders interfere with Consumers' or Detroit Edison's rights to recover the avoided cost rates in the PPAs after the year 2007. Plaintiffs appealed the orders under state law to the Michigan Court of Appeals.

Plaintiffs filed these actions seeking declarations that the MPSC's restructuring orders violate their rights under PURPA. Plaintiffs allege that if the orders can be interpreted as disallowing recovery of the QFs' avoided cost rates after the year 2007, the "regulatory out" clauses[5] in their PPAs will permit Consumers and Detroit Edison to reduce their payments to Plaintiffs which, in turn, will cause Plaintiffs substantial financial losses.

**5.** A "regulatory-out" clause provides for renegotiation of rates or termination of the purchase contract in the event a judicial, administrative, or other governmental agency takes

### *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing *Improvement Co. v. Munson,* 14 Wall. 442, 448, 20 L.Ed. 867 (1872)).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus.*

some action that impairs the utility's ability to recover its costs from ratepayers. *See Freehold,* 44 F.3d at 1193 n. 12.

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### *Discussion*

## I. Declaratory Judgment

■ Plaintiffs' contention in this case is that the Restructuring Orders violate their rights under PURPA because the Restructuring Orders can be interpreted as prohibiting Consumers and Detroit Edison from recovering a portion of their stranded costs after the year 2007. Plaintiffs assert that if that interpretation is correct, they stand to lose large amounts of their avoided cost rates because Consumers and Detroit Edison have the right to reduce their payments to Plaintiffs under the "regulatory out" clauses in Plaintiffs' PPAs.

Defendants contend that Plaintiffs' argument must be rejected because Plaintiffs' assertion that the Restructuring Orders may prevent utilities from recovering "stranded costs" beyond 2007 is premature and uncertain, the limitation on recovery of "stranded costs" in the Restructuring Orders only relates to customers who decide to purchase their electricity from alternate suppliers, and the MPSC has said in its orders that it has not revised the avoided cost rates in Plaintiffs' PPAs.

Based upon its review of the Restructuring Orders, the Court agrees with Plaintiffs that the limitation on recovery of "stranded costs" beyond the year 2007 in the Restructuring Orders can be interpreted in a manner that violates Plaintiffs' rights under PURPA to receive the full avoided cost rates from the utilities as set forth in their PPAs. Plaintiffs have shown that if the utilities are precluded from recovering their avoided costs, the utilities have the right to reduce their payments to plaintiffs pursuant to the "regulatory out" provisions in the PPAs. Thus, the Restructuring Orders can be interpreted in a man-

ner that will deprive Plaintiffs of the full avoided cost rate which they are entitled to receive under PURPA.

The Court previously rejected Defendants' arguments that Plaintiffs have failed to present a case or controversy and that the Restructuring Orders do not violate PURPA because the MPSC has said that they do not do so. Thus, to the extent Defendants assert those arguments in response to the instant motions, the Court rejects them again. With regard to Defendants' argument that the limitation on recovery of stranded costs only applies to customers who elect to obtain an alternate supplier of electricity, the Court does not glean such a limitation from the Restructuring Orders and, in light of Defendants' refusal to admit that the Restructuring Orders do not prohibit the utilities from recovering their stranded costs beyond 2007, the Court cannot accept Defendants' argument.

Defendants concede that PURPA prohibits them from altering the avoided costs rates once the MPSC has approved them and have freely acknowledged that their orders do not affect Plaintiffs' rights under their PPAs in violation of PURPA. However, Plaintiffs were forced to file this action because Defendants would not acknowledge that the Restructuring Orders do not do indirectly what they cannot do directly: cause a reduction of Plaintiffs' avoided cost rates by precluding the utilities from recovering their avoided costs from ratepayers. Frankly, in light of Defendants' statement in their brief that "Commission-approved QF rates are recoverable by the utility from its ratepayers whether before or after 2007," this Court cannot imagine why Defendants were unwilling to say so in their orders.[6] Nonetheless, the Court concludes that Plaintiffs are entitled to declaratory and injunctive

---

6. Plaintiffs have presented evidence which establishes that Defendants actually interpret the Restructuring Orders as precluding recovery of stranded costs after the year 2007. *See In re Detroit Edison Co.*, Case No. U–11726 (Dec. 28, 1998 MPSC Opinion & Order) (per-

mitting Detroit Edison to accelerate amortization of its Fermi 2 nuclear power plant on the basis that limitation period in Restructuring Orders was insufficient to permit recovery of stranded costs).

relief in connection with their rights under PURPA and will enter an appropriate order.

## II. Section 1983 Claim

■ Plaintiffs in case numbers 5:98–CV–21 and 5:98–CV–23 have alleged due process claims under 42 U.S.C. § 1983 and contend that they are entitled to attorneys fees under 42 U.S.C. § 1988 because they are prevailing parties. Although Defendants did not respond to this argument, the Court concludes that Plaintiffs may not base a § 1983 claim on a violation of PURPA. In *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the United States Supreme Court held that a class of fisherman could not bring a § 1983 claim under the Federal Water Pollution Control Act (FWPCA) and the Marine Protective Research and Sanctuary Act of 1972 (MPRSA). *See Middlesex County*, 453 U.S. at 20–21, 101 S.Ct. at 2626–27. The Court found that because the FWPCA and the MPRSA provided comprehensive remedies, it could be inferred that Congress intended to preclude suits under § 1983 for violations of those laws. *See id.* at 20, 101 S.Ct. at 2626. The Court stated that "the existence of [ ] express remedies demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983." *Id.* at 21, 101 S.Ct. at 2627.

In *Municipal Electric Utilities Association of New York State v. Conable*, 577 F.Supp. 158 (D.D.C.1983)(mem.op.), the court applied the holding in *Middlesex County Sewerage Authority* to reject the plaintiff's § 1983 claim. *See Municipal Elec. Util.*, 577 F.Supp. at 163–64. The court reasoned that the FPA was a detailed statutory scheme that provided plaintiff with specific statutory remedies, and thus the only remedies available were those provided under the FPA. *See id.* at 164.

The Court finds that the *Middlesex County Sewerage Authority* analysis is also applicable in this case. In particular, PURPA contains a detailed statutory scheme which provides specific remedies that enable QFs such as Plaintiffs to obtain judicial review of their rights under PURPA or under any rule or regulation promulgated by the FERC pursuant to PURPA. *See* 16 U.S.C. § 824a–3(g), (h). The specific and detailed remedies provided by the statute demonstrate congressional intent to preclude suits under § 1983 for violations of PURPA. Therefore, the Court finds that Plaintiffs may not maintain a claim under § 1983 based upon violation of their PURPA rights and, thus, are not entitled to attorney fees under § 1988.

### Conclusion

For the foregoing reasons, the Court will grant Plaintiffs' motions for summary judgment with respect to their requests for declaratory and injunctive relief regarding their rights under PURPA. The Court will deny Plaintiffs' motions for summary judgment in case nos. 5:98–CV–21 and 5:98–CV–23 with regard to their § 1983 claims and requests for attorney fees under § 1988.

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion filed this date,

**IT IS HEREBY ORDERED** that Plaintiffs' Motions for Summary Judgment in case nos. 5:98–CV–22 and 5:98–CV–24 (docket nos. 27 and 28) are **GRANTED,** and Plaintiffs' Motions for summary judgment in case nos. 5:98–CV–21 and 5:98–CV–23 (docket no. 30) are **GRANTED IN PART AND DENIED IN PART.** The motions in case nos. 5:98–CV–21 and 5:98–CV–23 are GRANTED with respect to Plaintiffs' claims for declaratory and injunctive relief with respect to their rights under PURPA and are **DENIED** with respect to Plaintiffs' claims under 42 U.S.C.

§ 1983 and requests for attorneys fees under 42 U.S.C. § 1988.

**IT IS FURTHER ORDERED, DECLARED AND ADJUDGED** that:

A. The Michigan Public Service Commission's ("MPSC") orders of June 5, 1997, October 29, 1997, January 14, 1998, and February 11, 1998 (collectively the "Restructuring Orders"), are preempted by PURPA and the Supremacy Clause of the United States Constitution to the extent that they prohibit any utility from recovering from its customers any charge for avoided costs (or "stranded costs") to be paid to Plaintiffs as qualifying facilities under PURPA pursuant to power purchase agreements ("PPA") between such utilities and Plaintiffs;

B. The MPSC's prior orders approving that avoided cost rates set forth in Plaintiffs' PPAs take precedence over the Restructuring Orders, and the utilities are entitled to collect their avoided costs set forth in the PPAs from their customers;

C. Defendants are permanently enjoined from enforcing the Restructuring Orders in any manner which denies any utility from recovering its avoided costs as set forth in Plaintiffs' PPAs or which precludes Plaintiffs from recovering the full avoided cost rate as set forth in their PPAs, including but not limited to interpreting or enforcing the Restructuring Orders to preclude any utility from recovering all or any portion of its avoided costs previously approved by the MPSC from its customers, whether before, during, or after the year 2007.